# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| **VIRGINIA GUILLEN-PEREZ**, |
| Plaintiff, |
| v. |
| **DISTRICT OF COLUMBIA**, |
| Defendant. |

Case No. 17-cv-2086 (CRC)

## MEMORANDUM OPINION

Plaintiff Virginia Guillen-Perez ("Guillen") worked as a call-center assistant in the District of Columbia Department of Employment Services (the "Department") from 2012 until 2016. After she was terminated purportedly because of customers' complaints about her poor customer service, she brought suit against the District—as well as the Department and its mayor—alleging that they had discriminated and retaliated against her, in violation of various federal and D.C. laws. On April 6, 2018, the Court granted in part and denied in part Defendants' motion to dismiss. See Mem. Op. & Order, ECF No. 16. The remaining parties proceeded to discovery on Guillen's remaining claims of discrimination on the basis of race and national origin and retaliation, in violation of Title VII of the Civil Rights Act, and interference with and retaliation for taking protected medical leave, in violation of the federal and D.C. Family and Medical Leave Acts. Discovery now complete, the District moves for summary judgment on those claims. The Court will deny the motion with respect to certain aspects of Plaintiff's Title VII discrimination and retaliation claims and grant it as to the rest.

## I. Background

### A. Factual Background

Guillen is a Hispanic woman who immigrated to the United States from the Dominican Republic. In September 2012, the Department hired Guillen on a term basis as a Clerical Assistant in the Office of Unemployment Compensation ("OUC") at Grade 5, Step 1 with an annual wage of $30,577. Def. Stmt. Facts ¶¶ 1-3. Guillen's initial appointment was for thirteen months and had to be renewed by the Department every six months. As Guillen's term appointment was repeatedly renewed, she received annual step increases to her salary. Id. ¶ 4.

The Department initially assigned Guillen to work in the American Jobs Center, but quickly reassigned her in December 2012 to work in the Unemployment Insurance Call Center ("Call Center"). Madison Dep. 15:20-16:1. There, Guillen was responsible for answering calls and responding to questions from claimants and applicants for unemployment benefits. Warrick Decl. ¶ 2; Guillen Dep. 16:13-17:7. At the time of Guillen's transfer, the Call Center was staffed by twelve to fifteen other representatives, two of whom were Hispanic and the rest of whom were African American. Guillen Dep. 21:17-22:8.

#### 1. FMLA Leave

In July 2014, Guillen requested FMLA leave after being diagnosed with breast cancer, which was approved by her supervisor at the time, Helen Carnavale, and the Department. Guillen Dep. 109:10-110:17. Guillen underwent surgery and took FMLA leave from October through December 2014. Id. 110:17. When Guillen returned to work in January 2015,

Xzaquoinett Warrick, an African American woman, had been hired as the new supervisor for the Call Center.

Warrick and Guillen apparently did not get along. Guillen had a number of follow-up medical appointments, for which she requested and received approval for leave to attend. Warrick Decl. ¶ 21; Ex. 1, Guillen Dep. 113:6-13. According to Guillen, "Warrick was not happy that [she] had been away from work on leave and continued to be having follow-up doctor's appointments." Pl. Resp. Interrog. ¶ 12. In June 2015, Warrick emailed Guillen her productivity report for the week of May 25, 2015, in which she commented "Your CALLS ANSWERED decreased (*due to your absences*). One MISSED CALL[] and THE LOWEST HOLD TIME. Good job overall." Def. Mot. Summ. J., Exh. 3 (emphasis added). According to Guillen, Warrick also altered the attendance reflected on her timesheets. Guillen Dep. 74:5-77:1.

### 2. Race and National Origin Discrimination

Guillen also complained to Warrick about other perceived double standards in the workplace, such as Warrick permitting African-American coworkers to show up late to work or to take unscheduled breaks but requiring Guillen to strictly follow the work schedule. For example, in July 2015, Warrick sent Guillen an email advising her to be "more cognizant" of her arrival time, which was scheduled to be 8:30 a.m. each day, as Warrick had noticed that Guillen's "arrival time ha[d] varied from [8:31 a.m. to 8:33 a.m.] for the past two weeks." Pl. Opp., Exh. 4. By contrast, Guillen contends that Warrick permitted Charmaine Harris, an African-American co-worker with whom Warrick was friendly, to have a more relaxed arrival

and break schedule.  See id., Exh. 11 at 4 (tracking by Guillen of Harris's sporadic arrival and break times).

Around that same time period, Guillen also began complaining about receiving less pay than her African-American co-workers.  According to Guillen, she was hired at Grade 5, while all other representatives in the Call Center were designated Grade 7 or above.  Guillen Dep. 36:18-22.  On February 27, 2015, Guillen filed a complaint against the Department with the Equal Employment Opportunity Commission ("EEOC").  The complaint alleged that the Department had violated the Equal Pay Act by paying all other representatives at the Call Center an annual salary of $40,000 or more, but paying Guillen an annual salary of, as of October 2014, only $34,000.  Pl. Opp., Exh. 5 at 2.  The EEOC dismissed Guillen's complaint on March 4, 2015 after being unable to conclude that the information that it had obtained from its investigation established any statutory violation.  Id.

Guillen also raised concerns about her unequal pay directly with the Department.  In a "[o]ne-on-one" meeting with Warwick in July 2015, Guillen requested a "pay increase," to which Warwick responded that there was "nothing she c[ould] do about it."  Guillen Dep. 79:4-8; Warrick Decl. ¶ 23; Pl. Opp., Exh. 11 at 7.  Guillen told Warwick that she was "going to go [through] other channels to request [a promotion] because [she was] doing the [same] job," to which Warwick responded, "fine."  Guillen Dep. 81:2-11.

Guillen then wrote to Monnikka Madison, who was the Office's Chief of Benefits, on August 1, 2015.  Id. 81:7-11; Madison Dep. 10:3-11:1.  Guillen explained that she "strongly believe[d] it [wa]s appropriate for [her] to be formally promoted to Grade 7 . . . because [she] d[id] the same work [that] everyone else in the Call Center d[id]."  Pl. Opp., Exh. 8.  Guillen emphasized the need for "internal equality in the workplace" and that she had been working at

the Call Center for three years and had an additional language skill.  Id.  Madison promptly

forwarded the email to Warwick.  Madison Dep. 21:7-19.

Two days later, on August 3, 2015, Warwick sent Guillen an Advance Written Notice of

Proposed Suspension of Ten Days.  Def. Mot. Summ. J., Exh. 10; Guillen Dep. 81:10-11.  The

Notice alleged that Guillen had engaged in "neglect of duty, [u]nreasonable failure to give

assistance to the public, incompetence and insubordination" in connection with three separate

incidents—taking place on May 20, July 8, and July 16, 2015—in which customers complained

about Guillen being rude and hanging up on them.  Def. Mot. Summ, J., Exh. 10 at 3.  Guillen's

union counsel responded that the proposed suspension was "unduly harsh."  Pl. Opp., Exh. 10.

Guillen filed an employment grievance with the Department on September 28, 2015

complaining of the Department's purported retaliation against her, her unequal pay, and

Warrick's unfavorable treatment of her.  Pl. Opp., Exh. 11.  Meanwhile, Guillen's term

appointment was up for renewal.  Before the proposed suspension was resolved, the Department

decided not to renew Guillen's appointment.  The "standard protocol" was for an employee's

direct supervisor to justify an employee's termination and for the Chief of Benefits to sign off on

that decision.  Madison Dep. 24:1-6.  Warrick made the recommendation to Madison not to

renew Guillen's term appointment in "late August 2015," and Madison signed off.  Id.; Warrick

Decl. ¶ 20.  Guillen received official notice of her termination on October 9, 2015.  Def. Mot.

Summ. J., Exh. 11.

B.  Procedural History

Following her termination, Guillen filed a charge with the D.C. Office of Human Rights

(which was deemed cross-filed with the EEOC due to the work-share agreement between the two

agencies) alleging various violations of District and federal law.  After receiving a right to sue

letter from the EEOC, Guillen brought suit in this Court against the District of Columbia, the Department, and District Mayor Muriel Bowser.

The Defendants moved to dismiss, which the Court granted in part and denied in part. See Mem. Op. & Order, ECF No. 16. The Court dismissed the Department and Mayor Bowser as defendants. Left standing were Guillen's (1) Title VII race and national origin discrimination claims, Am. Compl. Counts 1-2; (2) Title VII retaliation claim, id. Count 5; (2) federal and D.C. Family and Medical Leave Act interference and retaliation claims, id. Counts 8-10. The parties proceeded to discovery on those claims, and the District now moves for summary judgment.

## II. Legal Standard

Courts must grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the "absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1). In making that determination, the Court must "view the facts and draw reasonable inferences 'in the light most favorable to the [non-moving] party . . . .'" Scott v. Harris, 550 U.S. 372, 378 (2007) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)). The non-movant may not, however, rely on "mere allegations" or conclusory statements to defeat a motion for summary judgment. Veitch v. England, 471 F.3d 124, 134 (D.C. Cir. 2006).

## III. Analysis

### A. Counts 1 and 2: Race and National Origin Discrimination

Title VII makes it an "unlawful employment practice" for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Guillen alleges that the District unlawfully discriminated against her because she was Hispanic, which is a protected class under Title VII. See Figueroa v. Pompeo, 923 F.3d 1078, 1083 (D.C. Cir. 2019) ("Under established law, Title VII covers discrimination based on Hispanic or Latino ethnicity, a distinction 'as "odious" and "suspect" as those predicated' on race, color, and national origin." (quoting United States v. Doe, 904 F.2d 16, 21-22 (D.C. Cir. 1990)).

The "statutory text establishes two elements for an employment discrimination case: (i) the plaintiff suffered an adverse employment action (ii) because of the employee's race, color, religion, sex, or national origin." Brady v. Office of Sergeant at Arms, 520 F.3d 490, 493 (D.C. Cir. 2008). As to the first element, "not everything that makes an employee unhappy is an actionable adverse action." Russell v. Principi, 257 F.3d 815, 818 (D.C. Cir. 2001). An "adverse employment action" must be "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." Douglas v. Donovan, 559 F.3d 549, 552 (D.C. Cir. 2009) (quoting Taylor v. Small, 350 F.3d 1286, 1293 (D.C. Cir. 2003)).

As to the second element, a plaintiff may defeat a motion for summary judgment with "either direct or circumstantial evidence" of "intentional discrimination." Dunaway v. Int'l Bd. of Teamsters, 310 F.3d 758, 763 (D.C. Cir. 2002) (internal quotation marks omitted). If the plaintiff relies upon the latter, the Court turns to the familiar three-part framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973): *first*, the plaintiff must establish a prima facie case of discrimination; *second*, the employer may rebut the plaintiff's prima facie case by providing a nondiscriminatory reason for the adverse employment decision; and, *third*, the Court must then assess whether a reasonable jury could infer from the plaintiff's evidence

7

that the employer's proffered reason is merely pretext for discrimination.  Green v. Johnson, 208

F. Supp. 3d 307, 310 (D.D.C. 2016), aff'd sub nom. Green v. Nielsen, No. 16-5295, 2018 WL

1391714 (D.C. Cir. Mar. 1, 2018); see also McDonnell Douglas, 411 U.S. at 802-05; Brady, 520

F.3d at 494.

### 1. *Warrick's Negative Treatment of Guillen*

To the extent that Guillen's discrimination claims rest on Warwick's alleged negative

treatment of her—such as her "punitive scheduling and increased scrutiny" of Guillen's arrival

time, alteration of her timesheets, or verbal criticism—Guillen has not shown that any of those

actions rise to the level of "adverse employment actions."  Pl. Opp. 26-27; Def. Mot. Summ. J.

11; Am. Compl. ¶¶ 30, 34; Guillen Dep. 45:8-46:7, 74:5-75:2, 75:13-77:20.  There is no

evidence that any of those actions engendered "materially adverse consequences affecting the

terms, conditions, or privileges of employment or future employment opportunities such that a

reasonable trier of fact could find objectively tangible harm."  Douglas, 559 F.3d at 552 (internal

quotation marks omitted); see, e.g., Morales v. Gotbaum, 42 F. Supp. 3d 175, 190 (D.D.C. 2014)

(noting that "giving negative performance feedback . . . do[es] not constitute adverse

employment action[]" (internal quotation marks omitted)).  Nor is there evidence that scrutiny of

Guillen's arrival time, productivity reports, or timesheets factored into the Department's decision

to terminate her employment or had any other tangible effect on her or her employment.  See

generally Burlington Indus., Inc. v. Ellerth 524 U.S. 742, 762 (1998) ("A tangible employment

action in most cases inflicts direct economic harm.").  These incidents reflecting Warrick's

negative treatment of Guillen thus do not constitute "adverse employment actions" for purposes

of Title VII.  See Brady, 520 F.3d at 493.

Accordingly, the Court will grant summary judgment to the District on the aspects of Guillen's Title VII discrimination claims in Counts 1 and 2 that are based on those actions. The Court will focus its McDonnell-Douglas analysis on the Department's failure to promote Guillen and termination of her employment, which, the District concedes, undoubtedly constitute "adverse employment actions" cognizable under Title VII.[1]  See Am. Compl. ¶ 86; Douglas, 559 F.3d at 552 (listing "firing" and "failing to promote" as "significant change[s] in employment status" (quoting Taylor, 350 F.3d at 1293)).

### 2.  Failure to Promote

Guillen contends that the District violated Title VII by refusing to promote her from Grade 5 to Grade 7. Am. Compl. ¶ 86; Guillen Dep. 77:21-78:8. Guillen "does not claim she sought promotion into a vacant position"; "[r]ather, she claims, with her current responsibilities, she should have received an increase in grade and salary." Taylor, 350 F.3d at 1294. To make out a prima facie case under such circumstances, Guillen "must show that she sought and was denied a promotion for which she was qualified, and that 'other employees of similar qualifications . . . were indeed promoted at the time the plaintiff's request for promotion was denied.'" Id. (quoting Bundy v. Jackson, 641 F.2d 934, 951 (D.C. Cir. 1981)) (alteration in original).

Guillen fails to establish a prima facie case. As to Guillen's burden to show that she was qualified for a promotion to Grade 7, there is nothing in the record from which the Court could

---

[1] In its April 6, 2018 Memorandum Opinion and Order, the Court dismissed Guillen's Title VII claims in Counts 1 and 2 to the extent that they were based on alleged negative "performance evaluations" because Guillen had not adequately exhausted her remedies as to those claims.  See Mem. Op., ECF No. 16, at 11-12 (Apr. 6, 2018); Am. Compl. ¶ 86.

discern the Department's specific criteria for promoting an employee to Grade 7 or whether Guillen met those criteria. Harris testified, for example, that she came into the Call Center at Grade 7 because she had previously been employed by the federal government and the Department was required to match her previous salary. Harris Dep. 26:6-14. Guillen did not have similar prior experience, and the record does not show what level of experience was required for Guillen to be promoted to Grade 7.

Even assuming that Guillen was qualified to be promoted to Grade 7 after working at the Department for three years, Guillen has not shown that any other employee with similar qualifications was promoted at the time that her request for a promotion to Grade 7 was denied. See Taylor, 350 F.3d at 1294; Cones v. Shalala, 199 F.3d 512, 517 (D.C. Cir. 2000). In fact, according to the Department, there was a city-wide freeze on promotions during Guillen's tenure at the Department, during which the only path to promotion to a higher grade level was through application to an open position.[2] See Def. Resp. Interrog. ¶ 13; Def. Stmt. of Facts ¶¶ 66-68. Consistent with that characterization, Harris testified that "someone's grade gets bumped up" only "[w]hen they apply for a new position . . . within the District Government. It's not given. You have to apply." Harris Dep. 21:18-22:2.

To rebut this evidence, Guillen merely speculates that "others were promoted . . . from time to time," but does not identify any particular employee that was promoted or offer any evidence as to whether any such employee was similarly situated to her. Guillen Dep. 78:22-

---

[2] Guillen testified that she applied in 2013 to a vacant position in a different unit within the Department and was denied the position. Guillen Dep. 39:22-41:8. But, Guillen does not allege that the relevant decisionmakers denied her that position because of her race or national origin or that they were the same decisionmakers as those who refused her request in July 2015 for a promotion to Grade 7. The Court thus does not see how the 2013 non-selection provides a viable basis for Guillen's failure to promote claim.

79:17.  This "mere speculation[] [is] insufficient to create a genuine issue of fact" as to whether other similarly situated employees were promoted at the time that Guillen's request for a promotion was denied.  Brown v. Brody, 199 F.3d 446, 459 (D.C. Cir. 1999) (internal quotation marks omitted); Taylor, 350 F.3d at 1294.

Guillen thus fails to meet her burden to establish a prima facie case with respect to her failure to promote claim.  Accordingly, the Court will grant summary judgment to the District on Counts 1 and 2 to the extent that Guillen's Title VII discrimination claims are based on the Department's failure to promote her.

### 3. October 2015 Termination

Guillen also contends that the District violated Title VII by terminating her employment in October 2015.  Am. Compl. ¶¶ 84-86, 90-92.  The District contends that it "chose not to renew [Guillen's] term appointment based on her continued customer service failures . . ."  Def. Resp. Interrog. ¶¶ 9, 12.  The D.C. Circuit has held that "[w]hen the employer properly presents a legitimate, nondiscriminatory reason [for the adverse employment action], the District Court 'need not—and should not—decide whether the plaintiff actually made out a prima facie case' because it better spends its limited resources on assessing the third [McDonnell-Douglas] prong."  Figueroa, 923 F.3d at 1087 (quoting Brady, 520 F.3d at 494).

"But the Brady shortcut applies only if . . . the employer [meets] its burden, at the second prong, 'to articulate a legitimate, nondiscriminatory reason for its action.'"  Id. (quoting Wheeler v. Georgetown Univ. Hosp., 812 F.3d 1109, 1114 (D.C. Cir. 2016)).  The District identifies three specific incidents to support its justification for firing Guillen: (1) an incident on May 20, 2015, in which a customer emailed a complaint to the Department stating that Guillen was rude, talked over her, and eventually hung up on her in response to an inquiry about a debit card, see Def.

Mot. Summ. J., Exh. 8; (2) an incident on July 8, 2015, in which a customer called the Department to complain about Guillen, after an escalated verbal exchange, hanging up on her when asked for her name, see id., Exh. 10 at 2; (3) an incident on July 16, 2015, in which a customer called the Department to complain about Guillen being rude and hanging up on him in response to an inquiry about a certification form, see id. The record contains recordings of the calls at issue, see id., Exh. 9, an email documenting the complaint relating to one of those incidents, see id., Exh. 8, a copy of the Advance Written Notice of Proposed Suspension based on those incidents, see id., Exh. 10, and witness testimony observing Guillen "getting loud on the phone and disconnecting the call," see Harris Dep. 48:7-10. The Court thus concludes that the District has provided an "'adequate' evidentiary proffer" and a sufficiently "clear and reasonably specific explanation" for the decision to terminate Guillen's employment, such that the Court may "properly move past the second step." Figueroa, 923 F.3d at 1087 (internal quotation marks omitted).

The "central question" then becomes whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory . . . reason was not the actual reason and that the employer intentionally discriminated . . . against the employee." Allen v. Johnson, 795 F.3d 34, 39 (D.C. Cir. 2015) (quoting Brady, 520 F.3d at 494). There is no dispute that the calls at issue occurred or that customers complained about them. Guillen contends, however, that such customer complaints were routine within the Department and that Warrick pulled the call recordings in order to drum up a pretext for terminating her employment. The Court concludes that Guillen has offered sufficient "circumstantial evidence" from which a reasonable jury could infer that the "employer's stated

reason . . . was not the actual reason" for her termination "and that the real reason was prohibited discrimination or retaliation." Id. at 40.

For one, the record reflects a genuine dispute as to whether the Department "treated other, similarly situated employees better." Id. Guillen testified that "everybody got complaints" from customers because "it happened often that claimants due to the circumstances they are going through . . . are upset," but "[n]obody was disciplined" for those complaints. Guillen Dep. 84:1-86:15. According to Guillen, "there was one complaint that went all the way down to the Mayor's office and that person was never disciplined." Id. 84:3-5.

Defendant does not directly dispute that there were Department employees that received customer complaints that were not terminated. Warrick's declaration that she "recommended the termination of [one] African-American subordinate, because she, like Plaintiff, hung up on claimants and was argumentative with them" in 2016, Warrick Decl. ¶ 26, is insufficient to rebut Guillen's testimony that others who received similar customer complaints while she worked there from 2012 to 2015 were not terminated. See Steele v. Mattis, 899 F.3d 943, 950 (D.C. Cir. 2018) ("[A]t the summary judgment stage, [a] 'he said, she said' credibility determination must be resolved in favor of [the non-moving party].").  The fact that termination "didn't happen to others" who received customer complaints supports Guillen's theory that the real reason for her termination was "bias against Latinos." Guillen Dep. 83:18-84:5.

The record also contains evidence that the District "failed to 'follow established procedures or criteria'" with respect to Guillen's termination. Allen, 795 F.3d at 40 (quoting Brady, 520 F.3d at 495 n.3).  The undisputed record shows that the District has a progressive discipline policy, which provides that an employee accused of misconduct should receive: (1) a verbal warning; (2) a written warning; (3) a suspension; and (4) termination. See Pl. Opp. 23;

Harris Dep. 41:14-43:8; Def. Resp. Interrog. ¶ 14.  Guillen testified that she was not informed—in any form, let alone a formal verbal or written warning—about the customer complaints relating to the July 8 and July 16 calls until she received the notice of proposed suspension on August 3.  See Guillen Dep. 97:15-16; Pl. Opp., Exh. 11 at 5.  And, in another apparent departure from the established progressive discipline policy, the undisputed record shows that Guillen never actually served the proposed suspension prior to her termination in October 2015.

The District contends that Guillen "was provided feedback, coaching, training and ample opportunity to improve her customer service delivery" but failed to do so.  Def. Resp. Interrog. ¶ 12; Def. Mot. Summ. J., Exh. 10 at 2; Warrick Decl. ¶ 18.  The only evidence in the record of any customer service counseling is a single email concerning the May 20 call, in which Warrick forwarded the customer's complaint to Guillen with a statement, "This behavior is unacceptable."  Def. Mot. Summ. J., Exh. 8.  But, as the Union's response to the Notice of Proposed Suspension noted, "[a]t no time did the supervisor provide any instructions on how to handle future calls with claimants or that Ms. Guillen w[ould] be disciplined if this type of behavior continue[d]."  Pl. Opp., Exh. 9 at 3.  There is no evidence that Warrick or anyone else in the Department communicated with Guillen about the July 8 or July 16 calls.  The record thus reflects a genuine dispute as to whether the District departed from its established progressive discipline policy before issuing Guillen the proposed suspension and eventually firing her.

To be sure, the record contains evidence that the Department sometimes departed from its progressive discipline policy when dealing with particularly egregious misconduct.  Harris testified, for example, that another non-Hispanic African-American employee, Ms. Tierra, was terminated for "cussing a customer out over the phone."  Harris Dep. 49:5-19.  After the customer "called back in to complain," management "pulled the tape, they heard the

14

conversation, and they walked her out" that day.  Id. 50:3-19.  The fact that Guillen was not walked out on the day of the customer complaints but was terminated several months thereafter suggests that the Department did not consider Guillen's customer service failures so egregious as to warrant immediate termination—and perhaps, not egregious enough to warrant termination at all.

Finally, a reasonable jury might infer pretext from the Department's "general treatment" of Hispanic employees.  Brady, 520 F.3d at 495 n.3.  Much of Guillen's briefing is focused on Warrick's preferential treatment of non-Hispanic employees.  For example, Warrick emailed Guillen on July 9, 2015 chastising her for arriving between "8:31 [a.m.] and 8:33 [a.m.] for the past two weeks," which was past her designated start time of 8:30 a.m.  Pl. Opp., Exh. 7.  Meanwhile, Harris, an non-Hispanic African-American woman, was permitted to arrive between 8:45 a.m. and 9:00 a.m.[3]  Id., Exh. 11.  In another incident, as the call center employees were all packing up to leave a few minutes before 5:00 p.m., Warrick screamed at Guillen in front of everyone, "Virginia [it] is 4:59.  There is one minute left," while another non-Hispanic African-American employee, Vincent James, was permitted to depart early.  Id.

Moreover, the record shows that, during Guillen's employment, the call center employed about fifteen African-American men and women and three Hispanic women—Guillen, Ana Sagastume, and Loyda DeCosta.  According to Guillen, Warrick "cleared the department" of Hispanics by terminating her and transferring the only other Hispanic women to the American Jobs Center in July 2015 and September 2015.  Guillen Dep. 83:18-21.  The District contends

---

[3] Although Harris testified that Warrick permitted this schedule to accommodate Harris's need to take her son to school, Guillen points out that no similar accommodation was offered for her medical care needs.

that it transferred the other two Hispanic women "due to the increase of high customer traffic and staff shortage at the American Jobs Center." Warrick Decl. ¶ 30. But, the District does not explain why it chose those particular two women to be transferred, and a reasonable jury could infer from the fact that Sagastume and DeCosta's transfer and Guillen's termination occurred within a few months of each other that those actions were connected to their Hispanic ethnicity.

Taken as a whole, the Court concludes that the record contains sufficient evidence from which a reasonable jury could conclude that the Department did not fire Guillen because of her customer service failures but because she was Hispanic. See Allen, 795 F.3d at 40.[4] The Court thus denies summary judgment on Counts 1 and 2 to the extent that Guillen's Title VII discrimination claims are based on her termination.

B. Count 5: Title VII Retaliation

Guillen also alleges that the District "engaged in unlawful retaliation" against her "for opposing discrimination and participating in protected activity" under Title VII. Am. Compl. ¶ 100. Title VII prohibits employers from retaliating against employees for "oppos[ing] any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). "To prove unlawful retaliation, a plaintiff must show: (1) that [s]he opposed a practice made unlawful by Title VII; (2) that the employer took a materially adverse action against h[er]; and (3) that the employer took the action 'because' the employee opposed the practice." McGrath v. Clinton, 666 F.3d 1377, 1380 (D.C. Cir. 2012). The D.C. Circuit has interpreted Title VII's retaliation provision as extending protection to an employee's opposition "to a practice that the employee reasonably and in good faith *believed* was unlawful under the statute." Id. (citing George v.

_____

[4] That said, Guillen's handling of customers on the recorded calls provided to the Court was not a model of customer service, to say the least. See Def. Mot. Summ. J., Exh. 9.

Leavitt, 407 F.3d 405, 417 (D.C. Cir. 2005); Parker v. Balt. & Ohio R.R. Co., 652 F.2d 1012, 1020 (D.C. Cir. 1981)).

The same burden-shifting framework that applies to discrimination claims applies to retaliation claims; once a defendant demonstrates a nondiscriminatory justification for the adverse action, "a court reviewing summary judgment looks to whether a reasonable jury could infer retaliation from all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and [plaintiff's] evidence of retaliation." Gaujacq v. EDF, Inc., 601 F.3d 565, 577 (D.C. Cir. 2010) (internal quotation marks omitted).

### 1. February 2015 EEOC Charge

Guillen first contends that the District retaliated against her for filing an EEOC complaint on February 27, 2015 complaining of unequal pay.[5] There is no dispute that "[a]n EEOC complaint constitutes protected activity." Kilby-Robb v. Duncan, 77 F. Supp. 3d 164, 175 (D.D.C. 2015) (citing Hamilton v. Geithner, 666 F.3d 1344, 1357 (D.C. Cir. 2012)).

### a. Materially Adverse Action

Guillen identifies various actions that she claims were taken against her for filing the EEOC complaint, including a negative productivity report, "increased scrutiny, surveillance, false accusations, warnings, [and] punitive scheduling," and ultimately her termination. Pl. Resp. Interrog. ¶¶ 8-9; Guillen Dep. 75:3-7; Pl. Stmt. Facts ¶ 47. "A materially adverse employment action in the retaliation context is one that would 'dissuade a reasonable worker

---

[5] Although Guillen filed her complaint under the Equal Pay Act, which prohibits the discriminatory payment of wages based on gender, the conduct that she complained of—discrimination in pay on the basis of her ethnicity—would, if proven, state a claim under Title VII. See McGrath, 666 F.3d at 1380.

from making or supporting a charge of discrimination.'" Mitchell v. D.C., 304 F. Supp. 3d 110, 117 (D.D.C. 2018) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006)).

The Court finds that only the proposed suspension and termination rise to the level of materially adverse employment actions. See Durant v. D.C. Gov't, 875 F.3d 685, 698 (D.C. Cir. 2017), cert. denied, 138 S. Ct. 2608 (2018) ("A reprimand letter setting forth allegations of deficient work performance is not a materially adverse action absent a showing that the letter would have dissuaded a reasonable employee from engaging in protected activity."); Baloch v. Kempthorne, 550 F.3d 1191, 1199 (D.C. Cir. 2008) (concluding that a letter of reprimand containing "job-related constructive criticism" but no "abusive language" was not materially adverse); Gaujacq, 601 F.3d at 578 (concluding that no reasonable employee could find the employer's "brief, fleeting, and unadorned verbal statement as an act or threat of retaliation").

### b.  Causation

In any event, Guillen has not established a causal connection between her filing the EEOC complaint in February 2015 and any materially adverse employment action. "The causal connection component of the prima facie case may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." Mitchell v. Baldrige, 759 F.2d 80, 86 (D.C. Cir. 1985). Warrick affirmatively declared that she did not know that Guillen had filed an EEOC complaint prior to this lawsuit. See Warrick Decl. ¶ 22.

Guillen speculated in her deposition that Warrick must have been aware that she filed the EEOC charge because "when the Agency has received [the complaint][,] they are going to be called for that or made aware of that." Guillen Dep. 105:11-106:15. But, Guillen points to

nothing in the record that would indicate that "it was necessary for [Warrick] to be aware of [Guillen's] EEO[C] [charge]." Baldridge, 759 F.2d at 87 n.7. Indeed, the EEOC charge complains only of unequal pay and identifies Madison as Guillen's supervisor; nowhere is Warrick mentioned. See Pl. Opp., Exh. 5. Guillen's mere speculation about Warrick's awareness of her filing an EEOC charge is thus insufficient "to contradict [Warrick's] statement that [s]he did not know that . . . the plaintiff was engaged in EEO-protected activity before [s]he made h[er] non-renewal decision." Brooks v. Kerry, 37 F. Supp. 3d 187, 211 (D.D.C. 2014).

Guillen has thus failed to meet her burden to establish a prima facie case of retaliation with respect to her EEOC charge. Accordingly, the Court will grant summary judgment to the District on Count 5 to the extent that Guillen's Title VII retaliation claim is based on her filing the February 2015 EEOC complaint.

### 2. *August 2015 Email Complaining of Unequal Pay*

Guillen also contends that the District retaliated against her for sending an email to Madison complaining of discriminatory unequal pay and non-promotion. The undisputed record shows that Guillen sent Madison the email on August 1, 2015, see Pl. Opp., Exh. 8, that Madison shortly thereafter forwarded the email to Warrick, see Madison Dep. 21:7-22, and that Warrick sent Guillen an Advance Written Notice of Proposed Suspension on August 3, 2015, see Pl. Opp., Exh. 9.

### a. Protected Activity

The parties dispute whether Guillen's August 1, 2015 email to Madison qualifies as protected activity under Title VII. In that email, Guillen stated:

> I strongly believe it is appropriate for me to be formally promoted to Grade 7 of
> that position because I do the same work that everyone else in the Call Center does.
> I thus have the same responsibilities that everyone else has. I possess the

experience and skills required for the position, not to mention the additional language that provides me with an advantage over most of my colleagues.

Internal equality in compensation for a particular job helps prevent perceived or unintentional bias and low morale among workers.

Def. Mot. Summ. J., Exh. 13.

The Department argues that Guillen's email to Madison was not protected activity under Title VII because it "does not allege that she was being discriminated against." Id. at 13. To be sure, "[n]ot every [employee] complaint garners its author protection under Title VII. . . . While no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition." Broderick v. Donaldson, 437 F.3d 1226, 1232 (D.C. Cir. 2006); see also Achoe v. Clayton, No. 17-CV-02231 (CRC), 2018 WL 4374926, at *9 (D.D.C. Sept. 13, 2018) ("Expressing workplace concerns, even in an informal manner, may constitute protected activity," so long as "those expressions . . . make some reference to discrimination that would be unlawful under Title VII." (citing Battle v. Master Sec. Co., LLC, 298 F. Supp. 3d 250, 253 (D.D.C. 2018)). The Court concludes that the record, read in the light most favorable to Guillen, reflects a genuine dispute as to whether the August 1 email "allege[d] unlawful discrimination." Broderick, 437 F.3d at 1232.

In the email, Guillen explicitly emphasizes the need for "[i]nternal equality in compensation for a particular job" and requests a pay increase in the form of a formal promotion to Grade 7, presumably because everyone else in the Call Center was assigned a Grade 7 and she had "the same responsibilities" and did "the same work" that they did. Pl. Opp., Exh. 13. Although the August 1 email does not explicitly mention race or national origin, Guillen does

mention her "additional language [skill] that provides [her] with an advantage over most of [her] colleagues," which, read in context, is a reference to her Hispanic ethnicity.  Id.

Moreover, the record contains sufficient evidence from which a reasonable jury could that that Guillen "reasonably and in good faith *believed*" that her unequal pay "was unlawful under Title VII."  McGrath, 666 F.3d at 1380.  After all, Guillen had in February 2015 filed the EEOC charge complaining that the same conduct alleged in the August 1 email was unlawful discrimination.  See Pl. Opp., Exh. 5.  And, if Guillen could show that her non-promotion and unequal pay were in fact based on her being Hispanic, that would be a violation of Title VII. The record thus reflects a genuine dispute as to whether the August 1 email was protected activity under Title VII.

### b.  Materially Adverse Action

Two days after Guillen sent the email to Madison, Warrick sent Guillen an Advance Written Notice of Proposed Ten-Day Suspension.  See id., Exh. 9.  The parties dispute whether the proposed suspension constitutes a "materially adverse" employment action for the purposes of the Title VII retaliation provision.

As the Court has noted, a materially adverse employment action must be "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination."  Burlington N., 548 U.S. at 57.  Although the Defendant is correct that "courts have been unwilling to find adverse actions where the suspension is not actually served," Baloch, 550 F.3d at 1199; see also Johnson v. Hantman, No. 00-5447, 2001 WL 674637, at *1 (D.C. Cir. May 4, 2001) (refusing to recognize a "never-effected suspension" as "an adverse personnel action cognizable as a matter of law"), those cases did not involve evidence that the proposed suspension led to the employee's termination.

Here, by the District's own admission, the proposed suspension was a factor in its decision to terminate Guillen's employment. In its response to Guillen's interrogatories, the District stated that it "chose not to renew [Guillen's] term appointment, based on her continued customer service failures *and the pending proposed suspension* for her continued customer service failures, which had not been resolved by the expiration of Plaintiff's term appointment." Def. Resp. Interrog. ¶¶ 9, 12 (emphasis added). On this record, "[a] jury could find that a reasonable employee would have avoided" raising complaints about discrimination in promotion and compensation based on the proposed suspension, "particularly where [that proposed suspension] led to an agency termination decision." Lowe v. Jackson, 28 F. Supp. 3d 63, 79 (D.D.C. 2014) (finding that negative performance evaluations qualified as materially adverse actions where they ultimately led to the employee's termination). The Court thus concludes that the record reflects a genuine dispute as to whether the proposed suspension was materially adverse.

### c. Causation

Those threshold issues resolved, Guillen easily "may satisfy th[e] third element of a prima facie case by showing 'the employer had knowledge of the employee's protected activity, and . . . the adverse personnel action took place shortly after that activity.'" Holcomb v. Powell, 433 F.3d 889, 903 (D.C. Cir. 2006) (quoting Mitchell, 759 F.2d at 86) (alteration in original). The temporal proximity—less than two days—between Guillen's email to Madison and the Advance Notice of Proposed Suspension is sufficient to establish a causal connection between the two events. Moreover, there is no dispute that Warrick knew of the August 1 email when she issued Guillen the proposed suspension; Madison testified that she forwarded the email to Warrick soon after receiving it. Madison Dep. 21:3-7; see Jones v. Bernanke, 557 F.3d 670, 679

(D.C. Cir. 2009) ("To survive summary judgment . . . [a plaintiff] needn't provide direct evidence that [her] supervisors knew of [her] protected activity; [s]he need only offer circumstantial evidence that could reasonably support an inference that they did.").

The Court thus finds that the record contains sufficient evidence from which a reasonable jury could conclude that Guillen was issued the notice of proposed suspension because of her August 1 email complaining of discrimination. Accordingly, the Court concludes that Guillen has raised a genuine issue of material fact as to whether she has established a prima facie case of retaliation based on her August 1 email.

d. Pretext

The District maintains that it issued Guillen the proposed suspension—and eventually terminated her—because of her repeated customer service failures and not in retaliation for her complaint of discrimination. As the Court has explained, this is a specific and well-supported "legitimate" explanation that shifts the burden back to Guillen to produce sufficient evidence that the District's explanation was pretextual. Allen, 795 F.3d at 39.

"There are multiple ways in which circumstantial evidence may support an inference that an employer's stated reason for a challenged employment action was not the actual reason, and that the real reason was . . . retaliation." Id. at 40. For one, the two-day gap between Guillen's email to Madison on August 1 and her receipt of the notice of proposed suspension on August 3 could suggest pretext. See id. ("The temporal proximity of an adverse action close on the heels of protected activity is a common and highly probative type of circumstantial evidence of retaliation." (citing Hamilton, 666 F.3d at 1357-59)); Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 143 (2000) ("[T]he trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether

the defendant's explanation is pretextual.'" (quoting <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 256 (1981)) (alteration in original)).  Moreover, as the Court has explained with respect to Guillen's Title VII discrimination claims, a reasonable jury could also infer pretext from the evidence that the Department did not suspend or terminate other employees who received customer complaints, failed to follow its established progressive discipline policy, and generally treated employees who asserted their Title VII rights worse than who did not.  <u>See</u> <u>supra</u> pp. 12-16; <u>Allen</u>, 795 F.3d at 40.

The Court thus concludes that Guillen has raised a genuine dispute as to whether the District's asserted explanation—her customer service failures—was the real reason for her proposed suspension and eventual termination, and not retaliation for her complaint of discrimination.  The Court thus denies summary judgment on Count 5 to the extent that Guillen's Title VII retaliation claim is based on the August 1 email.

### 3. September 2015 Grievance

Finally, Guillen contends that she was fired in retaliation for filing an employment grievance with the Department on September 28, 2015.  That grievance complained of, among other things, Warrick's alleged negative treatment of her, her unequal pay, and the Department's purported retaliation against her for sending the August 1 email.  Pl. Opp., Exh. 11.  There is no dispute that Guillen's grievance constitutes protected activity or that her termination is materially adverse.

Guillen has failed, however, to meet her burden to establish a causal connection between her filing the grievance on September 28 and her termination on October 9.  Although there is

close temporal proximity between the two events, there is no evidence that Warrick learned of Guillen's grievance prior to deciding to recommend her termination.

Warrick declared that she made her recommendation to Madison not to renew Guillen's appointment in "late August 2015." Warrick Decl. ¶ 20. That was well *before* Guillen filed her grievance in late September. See Terveer v. Billington, 34 F. Supp. 3d 100, 119 (D.D.C. 2014) ("[A]n adverse employment action that was already contemplated before a plaintiff engaged in protected activity cannot be evidence of retaliation the Department contends."); Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."). Guillen does not point to anything in the record that would indicate that Warrick made her termination decision after September 28; to the contrary, Guillen's own grievance states that there was "rumor" going around the office as early as August 5 that she was going to be fired for hanging up on a customer. Pl. Opp., Exh. 11 at 6.

In any event, Warrick declared that she "was not aware of Plaintiff's September 2015 grievance complaining about discrimination until Plaintiff brought this lawsuit." Warrick Decl. ¶ 22. Guillen's mere speculation that Warrick knew of the grievance prior to October 9 cannot create a genuine issue of material fact. See Brooks, 37 F. Supp. 3d at 211. Guillen thus fails to establish a prima facie case of retaliation with respect to her filing the employment grievance. Accordingly, the Court will grant summary judgment to the District on Count 5 to the extent that Guillen's Title VII retaliation claim is based on the September 28 Grievance.

C.  Counts 8, 9, and 10: FMLA and DCFMLA Interference and Retaliation

Finally, Guillen alleges that the Department interfered with and retaliated against her taking leave protected by the federal Family and Medical Leave Act ("FMLA") and the District of Columbia Family and Medical Leave Act ("DCFMLA").  Because the FMLA and DCFMLA operate under similar legal standards, the Court will analyze these claims together.  See Glekeln v. Democratic Cong. Campaign Comm., Inc., 199 F.3d 1365, 1367 (D.C. Cir. 2000).

The FMLA and the DCFMLA entitle an employee to take certain amounts of unpaid leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee," 29 U.S.C. § 2612(a)(1)(D); see also D.C. Code § 32-503(a), and, upon return from FMLA leave, "to be restored . . . to the position of employment held . . . when the leave commenced" or "an equivalent position," 29 U.S.C. § 2614(a)(1).  The FMLA also makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, [this] right," id. § 2615(a)(1), or "to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]," id. § 2615(a)(2).

Although Guillen separately pleads an FMLA "interference," Am. Compl. ¶¶ 122-26, and "retaliation" claim, id. ¶¶ 127-31, it is not clear from her briefing whether the two claims are actually distinct.  As best the Court can tell, Guillen advances only a "backwards-looking 'retaliation' theory" and not a "forward-looking 'interference' one."  Gordon v. U.S. Capitol Police, 778 F.3d 158, 165 (D.C. Cir. 2015); compare McFadden v. Ballard Spahr Andrews & Ingersoll, LLP, 611 F.3d 1, 6 (D.C. Cir. 2010) (recognizing as a "retaliation" claim the plaintiff's allegation that the employer "denied [the plaintiff's] request for reassignment and terminated her in order to retaliate for her having requested and taken leave due her under the FMLA"), with id.

at 7 (recognizing as an "interference" claim the plaintiff's allegation that the employer "misinform[ed] her about the amount of leave to which she was entitled and . . . pressur[ed] her not to take leave").

It is undisputed that Guillen applied for, and was granted, FMLA leave in July 2014, which she took from October through December 2014 in relation to her breast cancer surgery and that the Department did not discourage or prevent her from taking that leave. Guillen Dep. 109:10-110:17. Although "acts of the employer that operate as retaliation for [an] initial request may also operate as interference with [] later requests for use," Gordon, 778 F.3d at 161, Guillen does not allege that she wanted to take FMLA leave in 2015 or at any other point in the future and was discouraged or prevented from doing so by the conduct of those in the Department after she returned from FMLA leave.

Whether pleaded under 29 U.S.C. § 2615(a)(1) or § 2615(a)(2), Guillen's fundamental complaint seems to be that the Department punished her after the fact for having taken FMLA leave, not that it actively prevented her from doing so. See id. (recognizing "a good deal of overlap in the coverage of § 2615(a)'s two subsections"); see also Williams v. Verizon Washington, D.C. Inc., 304 F. Supp. 3d 183, 190 (D.D.C. 2018) ("Regardless of the precise subsection of FMLA under which a retaliation claim arises, courts have applied the [McDonnell Douglas] burden-shifting framework . . . to evaluate retaliation claims under the FMLA."). Accordingly, the Court will construe Counts 8, 9, and 10 as raising only an FMLA retaliation claim.

"The elements of a prima facie case of FMLA retaliation are the well-known triad: (1) the employee 'engaged in a protected activity under this statute'; (2) the employee 'was adversely affected by an employment decision'; and (3) 'the protected activity and the adverse

employment action were causally connected.'" Gordon, 778 F.3d at 161 (quoting Gleklen, 199

F.3d at 1368).  The D.C. Circuit has "imported Title VII's prima facie case and burden-shifting

regime to the FMLA retaliation context . . . ." Id. (citing Gleklen, 199 F.3d at 1367-68).  As

explained below, the Court concludes that Guillen failed to meet her burden to establish a prima

facie case of FMLA retaliation.

### 1.  Protected Activity

It is undisputed that Guillen's exercise of her right to take FMLA leave in late 2014 was

protected activity under the FMLA,[6] see id. at 167, and the DCFMLA, see Chang v. Inst. for

Pub.-Private Partnerships, Inc., 846 A.2d 318, 329 (D.C. 2004).  Much of Guillen's briefing,

however, is focused on her follow-up medical appointments after she returned from FMLA leave

in early 2015.  See Guillen Dep. 49:15-17; Pl. Resp. Interrog. ¶ 12.  It is undisputed that the

Department approved all of Guillen's requests for sick or annual leave to attend these

appointments.  See Guillen Dep. 111:13-112:13, 113:6-13; Warrick Decl. ¶ 21; Pl. Resp.

Interrog. ¶ 12.

Guillen nonetheless complains that Warrick gave her grief for requesting leave to attend

these appointments, see Pl. Stmt. Facts ¶ 14; Pl. Resp. Interrog. ¶ 12; Pl. Opp., Exh. 13, and that

Warrick manipulated Guillen's productivity reports to include the time that she was out on leave

at these appointments so as to increase her "off phone" time metric, see Guillen Dep. 68:7-71:1.

To the extent that Guillen's FMLA retaliation claim is based on the theory that Warrick chastised

---

[6] It is an open question in this Circuit whether taking FMLA leave is cognizable as a
"protected activity" under § 2615(a)(2), which refers to the employee's "*opposing any practice*
made unlawful by [the FMLA]."  29 U.S.C. § 2615(a)(2) (emphasis added).  But, the Circuit has
recognized that a plaintiff may bring a retaliation claim based on her taking of FMLA leave
"under § 2615(a)(1), which contains no requirement that she 'oppose any practice,'" Gordon,
778 F.3d at 162, which the Court construes Guillen to have alleged here.

her for taking sick and annual leave to attend doctor's appointments, that aspect of her claim is not cognizable under the FMLA.  See Harris v. D.C. Water & Sewer Auth., 172 F. Supp. 3d 253, 268 (D.D.C. 2016) ("To avail [her]self of the protections of the FMLA, an employee must specifically take FMLA leave; naturally, all absences from work and all types of leave are not covered.").  The Court will thus focus its analysis on the evidence of the Department's retaliation against Guillen for taking *FMLA* leave in late 2014, which is the only cognizable protected activity discernible from the record.

> 2. *Materially Adverse Action*

For the purposes of Guillen's FMLA retaliation claim, "[a] materially adverse action is one that 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Cole v. Powell, 605 F. Supp. 2d 20, 26 (D.D.C. 2009) (quoting Burlington N., 548 U.S. at 68).  Guillen alleges a laundry list of purportedly adverse actions taken against her for exercising her FMLA rights.  These include Warrick's "punitive scheduling, excessive scrutiny, criticism of Guillen for taking many doctor['s] appointments," and "the failure [of the Department] to promote Guillen to a Grade 7 level position like all other comparators in the call center after she returned from her FMLA leave in January 2015."  Pl. Opp. at 43; see id., Exh. 13; Pl. Stmt. Facts ¶ 14; Pl. Resp. Interrog. ¶ 12; Guillen Dep. 68:7-22.  The Court has already explained why Warrick's general negative treatment of Guillen does not rise to the level of "materially adverse."  See supra Section III.A.1.  The Court will thus grant summary judgment to the District on Counts 8, 9, and 10 to the extent that Guillen's FMLA and DCFMLA claims are based on these actions.  The Court will focus its causation analysis on Guillen's non-promotion in July 2015 and termination in October 2015, which, the Court has explained, are materially adverse.

3. *Causation*

To prove retaliation, a plaintiff must prove that "the employer took the [adverse] action 'because' the employee [engaged in protected activity]." Harris v. D.C. Water & Sewer Auth., 791 F.3d 65, 68 (D.C. Cir. 2015) (quoting McGrath, 666 F.3d at 1380); see McFadden, 611 F.3d at 6 (recognizing that Title VII and FMLA retaliation claims operate under "essentially the same analytical framework"). Guillen has not drawn a causal connection between her taking of FMLA leave in late 2014 and any materially adverse employment action.

As an initial matter, there was not sufficient temporal proximity between Guillen's taking FMLA leave from October to January 2015 and the denial of Guillen's request for a promotion in July 2015 or her termination in October 2015 to permit an inference of causation. See Greer v. Bd. of Trustees of Univ. of D.C., 113 F. Supp. 3d 297, 311 (D.D.C. 2015) ("When relying on temporal proximity alone to demonstrate causation, there is no bright-line rule, although three months is perceived as approaching the outer limit." (citing Hamilton, 666 F.3d at 1357-58)); Thomas v. D.C., 197 F. Supp. 3d 100, 114 (D.D.C. 2016) (refusing to infer causation where "at least three full months had passed between Plaintiff's EEO complaint and her placement on AWOL status").

To overcome this shortcoming, Guillen attempts to put forth "direct evidence" of Warrick being unhappy with her for being out in the form of verbal warnings and manipulation of Guillen's productivity reports and timesheets. Even assuming there is competent evidence in the record to support these assertions, Guillen points to nothing that indicates that Warrick was unhappy with Guillen specifically for taking FMLA leave in late 2014 rather than for taking leave in early 2015 to attend her follow-up medical appointments, which was not protected activity under the FMLA. See generally Roseboro v. Billington, 606 F. Supp. 2d 104, 111

(D.D.C. 2009) ("The FMLA permits termination when an employee remains absent from work after his qualified leave expires.").  The fact that the "doctor['s] appointments were for Guillen's cancer treatment, the same reasons she had been out on FMLA [leave]," Pl. Opp. 45, does not bear on whether Warrick harbored resentment toward Guillen for taking FMLA leave.  Indeed, Warrick did not become Guillen's supervisor until *after* she returned from FMLA leave, which makes it implausible to infer that Warrick was upset with Guillen for taking it.

Guillen has not raised a genuine issue as to whether her October 2015 termination or July 2015 denial of promotion request were related to her taking FMLA leave in late 2014.  The Court thus concludes that Guillen has failed to establish a prima facie case of FMLA retaliation.  Accordingly, the Court will grant summary judgment to the District on Counts 8, 9, and 10.

## IV.  Conclusion

For the reasons stated above, the Court will deny the Defendant's motion for summary judgment as to Guillen's Title VII discrimination claim under Counts 1 and 2 based on her termination and Title VII retaliation claim under Count 5 based on her proposed suspension and termination for sending the August 1 email.  The Court will grant the Defendant's motion with respect to the remaining aspects of Guillen's Title VII discrimination and retaliation claims under Counts 1, 2, and 5 and her FMLA claims under Counts 8, 9, and 10 in their entirety.

A separate order will follow this memorandum opinion.


Date:  November 26, 2019                                   CHRISTOPHER R. COOPER
                                                                        United States District Judge